UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CBG BIOTECH, LTD., et al., ) | |
| ) | Case No. 1:07-CV-00246 |
| Plaintiffs, ) | |
| ) | Judge Ann Aldrich |
| v. ) | |
| ) | |
| UNITED HEALTHCARE INSURANCE ) | |
| COMPANY OF OHIO, ) | |
| ) | MEMORANDUM AND ORDER |
| Defendant. ) | |
| ) | |

Before the court is plaintiffs' motion for a preliminary injunction ("PI") [Docket No. 10] in this action for injunctive and other relief under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(3). Plaintiffs CBG Biotech, Ltd. ("CBG"), CBG Biotech, Ltd. Group Health Plan ("CBG Plan"), and 26 individual plaintiffs (collectively, "Plan Participants/Beneficiaries") employed by CBG and covered, along with their dependents, by the CBG Plan seek relief against defendant United Healthcare Insurance Company of Ohio ("UHC") on the contract between UHC and CBG to insure the Plan Participants under the CBG Plan. The Plan Participants/Beneficiaries are assessed a portion of the premiums charged to CBG by UHC for the insurance coverage. Following the evidentiary hearing today, and after reviewing the testimony and evidence presented by the parties and the arguments of counsel both in their briefs and at the hearing, the court must deny the motion for the following reasons.

**I.  Background**

In March 2006, CBG had its employees complete applications for new health insurance coverage, effective April 1, 2006, and those applications were sent to UHC. UHC then provided group

health insurance coverage for CBG, with premiums set at about $8800 per month. CBG paid 60 percent of that premium, and the employees paid 40 percent. The terms of that coverage and the contract between CBG and UHC were embodied in a number of documents: (1) the Group Policy; (2) the Certificate of Coverage; (3) the Joint Health and Life Employer Application; and (4) the Benefit & Premium Confirmation.

In CBG's initial application to UHC for coverage, the threatened remedies for misrepresentations by CBG were "rescission of the group policy, termination of coverage, increase in premiums, or other consequences permitted by law." Joint Health and Life Employer Application, at 2. Also, in the confirmation of premiums, CBG promised that to the best of its knowledge, "all employees have answered application questions accurately and completely" and "that omissions and misrepresentations could result in non-payment of claims and/or voiding of coverage." Benefit & Premium Confirmation, at 1.

Article 3.1 of the Group Policy provides that premium rates may be changed in accordance with Exhibit 1 of the Group Policy, while Article 3.3 provides that "[UHC] may make retroactive adjustments for any . . . changes in coverage classification that are not reflected in [UHC] records at the time [UHC] calculate[s] the Policy Charge [the sum of all premiums for beneficiaries/dependents]." Group Policy, at 3. Exhibit 1 of the Group Policy states that UHC "reserve[s] the right to change the schedule of rates for Premiums, retroactive to the effective date, if a material misrepresentation relating to health status has resulted in a lower schedule of rates." Group Policy, at 8. Finally, Section 8 of the Certificate of Coverage provides that "[f]raud or misrepresentation" is grounds for UHC to end coverage to a particular individual, and that "[d]uring the first two years the Policy is in effect, [UHC] ha[s] the right to demand that [the individual] pay back all Benefits [UHC] paid to [the individual] . . . during the time

[the individual] w[as] incorrectly covered." Certificate of Coverage, at 59.

UHC informed CBG in a letter dated October 26, 2006 that one of the applications contained a material misrepresentation of fact regarding current health status, and that had the employee truthfully answered the questions on the application, UHC would have assigned a different premium to the CBG Plan. Rather than canceling coverage for that one individual, as UHC could have, UHC increased the premium to CBG and all of the Plan Participants/Beneficiaries to about $18,000 per month. UHC also requested that CBG pay the increased premium retroactively from April 2006 through October 2006, totaling about $68,650. None of the parties disputes the misrepresentation on the part of the employee. None of the parties disputes that the misrepresentation resulted in a lower total premium than would have been calculated had the information been made available to UHC in April 2006.

CBG claims that it neither knew about nor participated in the misrepresentation of fact, and that only a misrepresentation on CBG's part (instead of just on an employee's part) would allow UHC to raise the premium as it did. CBG made this argument in appealing UHC's decision to increase the premiums on November 17, 2006. The employee's wife died on January 10, 2007, but UHC still refused to rescind the premium increase, because doing so was not consistent with its company practices and procedures. UHC informed CBG that it would terminate coverage as of midnight, January 31, 2007, unless CBG paid the retroactive and scheduled increased premiums by that date. By an agreed order, CBG and UHC extended coverage to midnight of February 28, 2007, so that this court could rule on CBG's request for a preliminary injunction.

CBG alleges that it cannot obtain substitute health coverage for its employees effective March 1, 2007, and cannot afford the new premium – and that if UHC cancels its coverage, all of CBG's employees and their dependents will be left without health insurance. CBG is thus seeking an injunction

(a) barring UHC from raising the premium as a result of its employee's misrepresentation, (b) ordering UHC to refuse payment on any claims filed by that employee, and (c) to maintain the existing coverage at the original rate.

## II.     Discussion

To issue an injunction, the court "'must consider and balance four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.'" *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 432 (6th Cir. 2004) (quoting *Blue Cross & Blue Shield Mut. of Ohio v. Columbia/HCA Healthcare Corp.*, 110 F.3d 318, 322 (6th Cir.1997)).

UHC relies on Article 3.1 and Exhibit 1 of the Group Policy for its decision to retroactively and prospectively raise the premium, but CBG argues that the language in Exhibit 1 only permits increases to the premium if *CBG* made the misrepresentation, not simply one of its employees. In CBG's initial application to UHC for coverage, the threatened remedies for misrepresentations by CBG were "rescission of the group policy, termination of coverage, increase in premiums, or other consequences permitted by law." Joint Health and Life Employer Application, at 2. Also, in the confirmation of premiums, CBG promised that to the best of its knowledge, "all employees have answered application questions accurately and completely" and "that omissions and misrepresentations could result in non-payment of claims and/or voiding of coverage." Benefit & Premium Confirmation, at 1. CBG thus argues that because the only parties to the Group Policy are CBG and UHC (and not any CBG employees), because the application indicated that misrepresentations on *CBG's* part could result in

increased premiums, and because the confirmation of benefits and premiums indicated that employee misrepresentations could result in non-payment of claims or voiding of coverage, UHC could not therefore increase premiums based on employee misrepresentations where CBG did not know or was not involved.

Alternatively, CBG argues that if UHC can increase premiums based on employee (but not CBG) misrepresentation, the most equitable course of action would be for UHC to refuse to pay claims for that one employee or his dependents, and keep the premium rates for the rest of the employees as originally calculated. CBG also argues that UHC's premium increase amounts to constructive termination of the policy for misrepresentation, in violation of 42 U.S.C. § 300gg-12(b)(2), which only permits plan termination for misrepresentations by the employer. However, CBG does not cite any authority for its "constructive termination" argument, nor does it offer any authority suggesting that because UHC *may* choose to rescind coverage for one employee based on that employee's misrepresentation, it *must* therefore choose that course instead of increasing the premium for all employees. Thus, the case comes down to an interpretation of the four CBG Plan documents, and whether misrepresentations by an employee (but not by CBG) can be used by UHC to justify a premium increase under Exhibit 1 of the Group Policy. If so, then CBG does not have a substantial likelihood of success on the merits, and the injunction must be refused, because UHC would have the right to increase the premium and terminate coverage under 42 U.S.C. § 300gg-12(b)(1) because CBG refuses to pay the higher premium.

The court must look at the Plan documents' "plain meaning" in interpreting the contract between CBG and UHC. *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 556 (6th Cir. 1998) (citation omitted). Reading all four documents together, UHC clearly has its choice of four options when confronted with a misrepresentation concerning health status by a covered individual: (1) non-payment of claims; (2)

termination of coverage for that individual; (3) demand for repayment of benefits; and/or (4) increasing the total premium for the group. Nothing in the language of any of the four documents limits the ability of UHC to exercise its right under Exhibit 1 of the Group Policy to recalculate and retroactively increase premiums in response to a material misrepresentation that caused a lower premium. While the language quoted by CBG from the confirmation does list two remedies for employee misrepresentation, that language does not limit UHC's remedies to non-payment of claims or voiding of coverage; the language simply lists two possible consequences, not *all* possible consequences. Nor does any of the language in the four documents limit the ability of UHC to exercise its right to increase premiums only upon misrepresentation by CBG, as opposed to one of its employees. Therefore, UHC is well within its rights to retroactively and prospectively increase the total premium because of the misrepresentation made by one CBG employee. This court must find that CBG does not have a strong likelihood of success on the merits.

The court notes that despite being well within its contractual rights, neither UHC's witness nor its counsel offered a particularly complete or compelling explanation as to why UHC chose the option it did over the other three options. In other words, UHC's actions have the effect of causing hardship for numerous CBG employees even though those employees committed no misrepresentation, when UHC might have chosen a course that protected its position without causing this degree of hardship. The court finds that UHC's exercise of its contractual rights is very likely legal, but also very far from laudable in this case.

Because the court finds that CBG does not have a strong likelihood of success on the merits, the plaintiffs' motion for a preliminary injunction must be denied. The court recognizes and sympathizes with the potentially irreparable harm a loss of health insurance coverage will cause. *LaForest v. Former*

*Clean Air Holding Co.*, 376 F.3d 48, 55 (2d Cir. 2004). But no matter how great the harm, the court cannot ignore clear and unambiguous contractual language to grant injunctive relief.

### III. Conclusion

For the foregoing reasons, plaintiffs' motion for a preliminary injunction [Docket No. 10] is denied. This order is not final, but it is appealable, pursuant to 28 U.S.C. § 1292(a)(1).

IT IS SO ORDERED.

    /s/Ann Aldrich
ANN ALDRICH
UNITED STATES DISTRICT JUDGE

**Dated: February 27, 2007**